1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANAY GANDHI, derivatively on behalf of EQUINIX, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| CHARLES J. MEYERS, ADAIRE FOX-MARTIN, NANCI CALDWELL, GARY HROMADKO, THOMAS OLINGER, CHRISTOPHER PAISLEY, JEETU PATEL, SANDRA RIVERA, FIDELMA RUSSO, PETER VAN CAMP, and KEITH D. TAYLOR, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants, | |
| and | |
| EQUINIX, INC., | |
| Nominal Defendant. | |

1

Plaintiff Tanay Gandhi ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Equinix, Inc. ("Equinix" or the "Company"), brings this Verified Shareholder Derivative Complaint against Charles J. Meyers ("Meyers"), Adaire Fox-Martin ("Fox-Martin"), Nanci Caldwell ("Caldwell"), Gary Hromadko ("Hromadko"), Thomas Olinger ("Olinger"), Christopher Paisley ("Paisley"), Jeetu Patel ("Patel"), Sandra Rivera ("Rivera"), Fidelma Russo ("Russo"), Peter Van Camp ("Van Camp"), and Keith D. Taylor ("Taylor") (collectively, the "Individual Defendants" and, together with Equinix, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, including a review of publicly available information, including filings by Equinix with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought against certain Equinix officers and members of Equinix's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between May 3, 2019 and March 24, 2024, inclusive (the "Relevant Period").

2.    Equinix describes itself as "the world's digital infrastructure company." Equinix operates as a real estate investment trust ("REIT") for tax purposes. Equinix owns data centers in most parts of the world. As of February 2016, Equinix owned 260 data centers around the world. Other organizations lease space within these data centers to house their software.

3.    As a REIT, one of Equinix's key metrics is Adjusted Funds From Operations ("AFFO"). As discussed later, AFFO was a key metric used to determine executive compensation at Equinix throughout the Relevant Period. AFFO consists of a company's funds from operations,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

minus costs such as maintenance capital expenditure ("CapEx") and other spending to maintain the company's existing revenue bases.

4.    Integral to the Company's AFFO methodology is the treatment of CapEx. Recurring CapEx, which reduces AFFO, typically refers to capital expenditures made on a regular basis to support ongoing revenue. Non-recurring CapEx, meanwhile, generally applies to one-time expenses that are unlikely to repeat and does not reduce AFFO. The classification of capital expense, therefore, had a direct impact on the amount of AFFO reported to the market.

5.    Throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose: (i) the Company regularly overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

6.    The truth was revealed on March 20, 2024, investment research firm and short-seller Hindenburg Research released a report published a report titled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling An AI Pipe Dream As Insiders Cashed Out Hundreds of Millions" (the "Hindenburg Report"). The Hindenburg Report claimed that Equinix manipulated its accounting for AFFO, a key profitability metric for REITs, by misclassifying its recurring CapEx, or "maintenance CapEx," as nonrecurring "growth" CapEx, giving the appearance that the Company's cost to maintain its revenue base was lower than what it actually was.

7.    On this news, the Company's stock price declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

8.    On March 25, 2024, Equinix issued a press release announcing that the Audit Committee of the Board had commenced an independent investigation to review the matters referenced in the Hindenburg Report. The Company also announced that, shortly after the release of the Hindenburg Report, Equinix received a subpoena from the U.S. Attorney's Office for the Northern District of California. The press release further stated: "We believe we have earned the trust of our investors - and all our stakeholders - by reliably delivering on our commitments with integrity and meeting the requirements of our customers, as we have demonstrated throughout our 25-year history."

9.    On this news, the price of the Company's common stock declined again, from a closing price of $800.97 on March 22, 2024, to $792.52 on March 25, 2024.

10.    In light of the Individual Defendants' misconduct, the Company as well as Defendants Meyers and Taylor were named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California, captioned *Chan v. Equinix, Inc., et al.*, 3:24-cv-02656 (N.D. Cal.) (the "Securities Class Action.") The Securities Class Action has further subjected Equinix to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

13.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Equinix's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

15.     Plaintiff is a current shareholder of Equinix and has continuously held Equinix stock at all relevant times.

16.     Nominal Defendant Equinix is a Delaware corporation and its principal executive offices are located at One Lagoon Drive, Redwood City, California 94065. The Company's common stock trades on NASDAQ under the ticker symbol "EQIX."

17.     Defendant Meyers has served as a Company director since 2018 and as the Executive Chairman of the Board since June 2024. Defendant Meyers previously served as the Company's Chief Executive Officer ("CEO") and President. According to the proxy statement filed on Schedule 14A with the SEC on April 12, 2024 (the "2024 Proxy Statement"), for fiscal 2023, Defendant Meyers received $23,927,452 in total compensation from the Company. Defendant Meyers is named as a defendant in the Securities Class Action.

18.     Defendant Fox-Martin has served as a Company director since 2020 and as the Company's CEO and President since June 2024. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Fox-Martin received $334,663 in total compensation from the Company.

19.     Defendant Caldwell has served as a Company director since 2015. Defendant Caldwell currently serves as the Chair of the Board's Nominating and Governance Committee and as a member of the Talent, Culture, and Compensation Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Caldwell received $357,163 in total compensation from the Company.

20.     Defendant Hromadko has served as a Company director since 2003. Defendant Hromadko currently serves as the Chair of the Board's Finance Committee and as a member of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Nominating and Governance Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Hromadko received $377,163 in total compensation from the Company.

21.     Defendant Olinger has served as a Company director since 2011. Defendant Olinger currently serves as a member of the Board's Audit Committee and Finance Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Olinger received $438,459 in total compensation from the Company.

22.     Defendant Paisley has served as a Company director since 2007. Defendant Paisley currently serves as the Chair of the Board's Audit Committee and as a member of the Finance Committee and Nominating and Governance Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Paisley received $413,163 in total compensation from the Company.

23.     Defendant Patel has served as a Company director since 2022. Defendant Patel currently serves as a member of the Board's Talent, Culture, and Compensation Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Patel received $336,163 in total compensation from the Company.

24.     Defendant Rivera has served as a Company director since 2019. Defendant Rivera currently serves as the Chair of the Board's Talent, Culture, and Compensation Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Rivera received $344,663 in total compensation from the Company.

25.     Defendant Russo has served as a Company director since 2022. Defendant Russo currently serves as a member of the Board's Audit Committee. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Russo received $339,663 in total compensation from the Company.

26.     Defendant Van Camp has served as a Company director since 2000 and served as the Board's Executive Chairman from 2007 until June 2024. Defendant Van Camp currently serves as a Special Advisor to the Board. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Van Camp received a $400,000 salary from the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.     Defendant Taylor has served as a the Company's Chief Financial Officer ("CFO") since 2005. According to the 2024 Proxy Statement, for fiscal 2023, Defendant Taylor received $11,642,804 in total compensation from the Company. Defendant Taylor was named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers, directors, and/or fiduciaries of Equinix and because of their ability to control the business and corporate affairs of Equinix, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

29.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

1  the Company, as well as in the use and preservation of its property and assets. The conduct of the

2  Individual Defendants complained of herein involves a knowing and culpable violation of their

3  obligations as directors and officers of the Company, the absence of good faith on their part, and

4  a reckless disregard for their duties to the Company and its shareholders that the Individual

5  Defendants were aware or should have been aware posed a risk of serious injury to the Company.

6  ## CODE OF BUSINESS CONDUCT

7      33.    Equinix maintains a Code of Business Conduct (the "Code of Conduct"). In an

8  opening message from Defendants Fox-Martin and Meyers, the Code of Conduct states that it

9  "reflects the ethical values and standards foundation to Equinix" and "provides us with the

10  information, resources, and tools we need to create clear, consistent global standards for ethical

11  business conduct and compliance with laws." The Code of Conduct states that it "applies to every

12  Equinix officer, director and employee."

13      34.    In a section titled "Conflicts of Interest," the Code of Conduct states that "Each of

14  us has an obligation to do what is right for Equinix. This means avoiding situations that create–

15  or even appear to create–a conflict between our own personal interests and the Company's

16  interests. A conflict of interest is anything that impedes objectivity or effectiveness in our job

17  performance or decisions we make on behalf of Equinix."

18      35.    Under the sub-heading "Records and record-keeping," the Code of Conduct states

19  that "We have a responsibility to be honest and accurate in what we report and record in all

20  Equinix documents, including accounting records, time cards, expense reports, safety records,

21  business records, etc."

22      36.    In a section titled "Our Commitment to the Law," the Code of Conduct states that

23  "[a]s a global company, we must comply with the laws in all the places we do business. And as

24  Equinix employees, we are responsible for understanding and complying with all laws and

25  regulations that affect our jobs."

26  ## CODE OF ETHICS FOR CHIEF EXECUTIVE OFFICER AND SENIOR
    ## FINANCIAL OFFICERS

27

28                                      9

37.    Equinix also maintains a Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code of Ethics"), which provides the following additional obligations of the CEO, CFO, and principal accounting officer:

1. The CEO and all senior financial officers must adhere to honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

2. The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, and in other public communications made by the Company.  Accordingly, the CEO and each senior financial officer must (a) promptly to bring to the attention of the Audit Committee of the Company's Board of Directors any material information of which he or she becomes aware that affects the disclosures made by the Company in its public filings and (b) otherwise assist the Audit Committee in fulfilling its responsibilities.

3. The CEO and each senior financial officer must promptly bring to the attention of the Audit Committee any information that he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

4. The CEO and each senior financial officer must promptly bring to the attention of the General Counsel or CEO and to the Audit Committee any information that he or she may have concerning any violation of this Code or the Company's Code of Business Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

5. The CEO and each senior financial officer must promptly bring to the attention of the General Counsel or CEO and to the Audit Committee any information that he or she may have concerning evidence of a material violation, by the Company or any agent of the Company, of the securities or other laws, rules or regulations applicable to the Company and the operation of its business.

6. In the event of violations of the Code of Business Conduct or of these additional policies and procedures by the CEO or by one of the Company's senior financial officers, the Company's Board of Directors will determine, or designate appropriate persons to determine, appropriate actions to be taken. Such actions will be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Business Conduct and to these

additional procedures and may include written notices to the individual involved that the Board of Directors has determined that there has been a violation, censure by the Board of Directors, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board of Directors), or termination of the individual's employment. In determining what action is appropriate in a particular case, the Board of Directors or its designee will take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

### AUDIT COMMITTEE CHARTER

38.    The Company maintains a Charter for the Audit Committee (the "Charter"), which states that the purpose of the Audit Committee is to "oversee the Company's accounting practices, system of internal controls, audit processes, and financial reporting processes."

39.    In a section titled "Responsibilities and Authority," the Charter details the Audit Committee's role and obligations as follows, in relevant part:

*Processes, Controls and Risk Management*

1.  Reviewing periodically the Company's financial reporting processes and disclosure controls and processes, based on consultation with the Company's management, independent auditors, counsel and the internal auditors;

2.  Reviewing periodically the adequacy and effectiveness of the Company's internal control policies and procedures, based on consultation with the Company's management, independent auditors and the internal auditors;

3.  Reviewing the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC;

4.  Discussing areas of risk exposure related to the Committee's purpose, as well as certain of the Company's other major financial and non-financial risk exposures as agreed to with management and other Board committees, and the steps management has taken to monitor and control such exposures, based on consultation with the Company's management, independent auditors and the internal auditors;

\*        \*        \*

11

*SEC Reports and Other Disclosure*

16. Reviewing with:

- Management and the Company's independent auditors, before release, the audited financial statements and unaudited interim financial statements; and

- Management and the Company's independent auditors, before release, the Company's earnings announcements or financial releases and Management's Discussion and Analysis (MD&A) in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q;

17. Recommending to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K;

18. Preparing the Audit Committee report that the SEC rules require to be included in the Company's annual proxy statement;

19. Directing the Company's independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

20. Overseeing compliance with the disclosure requirements of the SEC, including disclosure of information regarding auditors' services and audit committee members, member qualifications and activities.

**CORPORATE GOVERNANCE GUIDELINES**

40.     Equinix maintains a document titled "Equinix, Inc. Board of Directors Guidelines on Significant Corporate Governance Issues" (the "Guidelines"), which details the Board's obligations as follows, in relevant part:

**1.   Primary Responsibilities**

The primary responsibilities of the Board are oversight, counseling and direction to the management of the Company in the interest and for the benefit of the Company's stockholders. The Board's detailed responsibilities include:

(a) Selecting, regularly evaluating the performance of, and approving the compensation of the Chief Executive Officer and other senior executives;

(b) Planning for succession with respect to the position of Chief Executive Officer if necessary and monitoring management's succession planning for other senior executives;

(c) Reviewing and, where appropriate, approving the Company's major financial objectives, strategic and operating plans and actions;

(d) Overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

(e) Overseeing the sustainability and human capital strategies of the company; and (f) Overseeing the processes for maintaining the integrity of the Company with regards to its financial statements and other public disclosures, and compliance with law and ethics.

## **SUBSTANTIVE ALLEGATIONS**

41.     The Relevant Period begins on May 3, 2019, when Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2019 (the "1Q19 Report"). Attached to the 1Q19 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

42.     The 1Q19 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.[1]

43.     The 1Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance***

---

[1] All emphasis added, unless otherwise noted.

*that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

44.    The 1Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, acquisition costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred

in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

45.    The 1Q19 Report included the following statement on stock-based compensation:

For the three months ended March 31, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 647,243 shares of restricted stock units to certain employees, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $429.03 and a weighted-average requisite service period of 3.67 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. ***The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the three months ended March 31, 2019***.

46.    The 1Q19 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers ***and ensure our IBX data centers and non-IBX offices remain operational***. [. . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:
- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

***Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers

*could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

47.     On July 31, 2019, during an earnings call with analysts and investors, Defendant Taylor stated that the Company was "raising 2019 guidance across the board, including a *substantial raise in our key AFFO and AFFO per share metrics due to better-than-expected revenue performance and improved operating leverage in the business*."

48.     On August 2, 2019, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2019 (the "2Q19 Report"). Attached to the 2Q19 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

49.     The 2Q19 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

50.     The 2Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected*.

51.     The 2Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, acquisition costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended

to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

52.     The 2Q19 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 697,174 shares of restricted stock units to certain employees*, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $434.17 and a weighted-average requisite service period of 3.66 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the six months ended June 30, 2019*.

53.     The 2Q19 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers *and ensure our IBX data centers and non-IBX offices remain operational*. [ . . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:

- human error;
- *equipment failure*;
  [ . . .]

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- *power loss*;
  [. . .]

***Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers ***could also result in lost profits or other indirect or consequential damages to our customers***. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results***.

54.     On October 30, 2019, during an earnings call with analysts and investors, Defendant Taylor stated that the Company's "Q3 adjusted EBITDA was better than expected, *primarily due to lower maintenance costs*."

55.     On November 1, 2019, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2019 (the "3Q19 Report"). Attached to the 3Q19 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

56.     The 3Q19 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded***

19

*that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

57.    The 3Q19 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected*.

58.    The 3Q19 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense

adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations, net of tax. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

59.    The 3Q19 Report included the following statement on stock-based compensation:

*For the nine months ended September 30, 2019, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 736,303 shares of restricted stock units to certain employees*, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $440.61 and a weighted-average requisite service period of 3.65 years. The valuation of restricted stock units with only a service condition or a service and performance condition requires no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the nine months ended September 30, 2019*.

60.    The 3Q19 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers *and ensure our IBX data centers and non-IBX offices remain operational*. [ . . .]

Our office buildings and IBX data centers are subject to failure resulting from, and infrastructure within such IBX data centers is at risk from, numerous factors, including:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*Problems at one or more of our IBX data centers, whether or not within our control, could result in service interruptions or significant equipment damage. We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

61.    On January 7, 2020, Defendant Meyers presented on behalf of the Company at the Citi Global TMT West Conference. During the conference, Defendant Meyers stated that he understood investors were focused on AFFO/share growth, specifically adding: "that's our kind of laser-focus in terms of a guiding light metric."

62.    During an earnings call held on February 12, 2020, Defendant Meyers stated, in relevant part:

We feel like it's our job to maximize long-term value creation . . . driving our own digital transformation are all things that are going to help us sustain *AFFO per share growth. And frankly, that's our lighthouse metric,* and we feel like it would be irresponsible not to invest behind the momentum that we have right now.

63.    On February 21, 2020, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report

1  was signed by Defendants Meyers, Taylor, Van Camp, Caldwell, Fox-Martin, Hromadko,

2  Paisley, and Rivera. Attached to the 2019 Annual Report were certifications pursuant to SOX

3  signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the

4  disclosure of any material changes to the Company's internal control over financial reporting, and

5  the disclosure of all fraud.

6        64.     The 2019 Annual Report contained the following statement about the Company's

7  internal controls:

8       Under the supervision and with the participation of our management, including our Chief
   Executive Officer and our Chief Financial Officer, we conducted an evaluation of our

9       disclosure controls and procedures, as such term is defined under Rule 13a-15(e)
   promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange

10      Act"). ***Based on this evaluation, our Chief Executive Officer and our Chief Financial***

11      ***Officer concluded that our disclosure controls and procedures were effective at the
   reasonable assurance level as of December 31, 2019***.

12       65.     The 2019 Annual Report further provided the following management report on

13 internal control over financial reporting:

14      Our management is responsible for establishing and maintaining adequate internal
   control over financial reporting, as such term is defined in Exchange Act Rule 13a-

15      15(f). ***Because of its inherent limitations, internal control over financial***

16      ***reporting may not prevent or detect misstatements***. Also, projections of any
   evaluation of effectiveness to future periods are subject to the risk that controls

17      may become inadequate because of changes in conditions, or that the degree of
   compliance with the policies or procedures may deteriorate.

18      Under the supervision and with the participation of our management, including

19      our Chief Executive Officer and Chief Financial Officer, we conducted an
   evaluation of the effectiveness of our internal control over financial reporting

20      based on the framework in *Internal Control – Integrated Framework* (2013)

21      issued by the Committee of Sponsoring Organizations of the Treadway
   Commission.

22
        Based on our evaluation under the framework in *Internal Control – Integrated*
23      *Framework* (2013), ***our management concluded that our internal control over***

24      ***financial reporting was effective as of December 31, 2019***.

25       66.     The 2019 Annual Report contained the following statement regarding the

26 "limitations on the effectiveness of controls":

27      ***Our management, including our Chief Executive Officer and Chief Financial***
   ***Officer, believes that our disclosure controls and procedures and internal***

28

*control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected.

67.     The 2019 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the

amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

68.    The 2019 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers ***and ensure our IBX data centers and non-IBX offices remain operational at all times***. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including:
> - human error;
> - ***equipment failure***;
> - [. . .]
> - ***power loss***;
> - [. . .]
>
> ***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers ***could also result in lost profits or other indirect or consequential damages to our customers***. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment***

*damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results.*

69.     On March 2, 2020, Defendant Taylor presented on behalf of the Company at the Morgan Stanley Technology, Media & Telecom Conference. Defendant Taylor highlighted to investors Equinix's outlier status as it generated more AFFO/share then the "next 6" public companies combined:

Going back to my comment in AFFO, we threw up an AFFO per share, so it sort of levels the playing field with all the different capital structures. And we had – *we deliver more AFFO per share than the next 6 combined, public companies combined*.

70.     On April 27, 2020, Equinix filed a proxy statement on Schedule 14A with the SEC (the "2020 Proxy Statement"), wherein Defendants solicited shareholder votes – in advance of an annual stockholder meeting to be held on June 18, 2020 – in favor of numerous proposals, including the election or re-election of ten individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

71.     The 2020 Proxy Statement stated that Equinix had adopted the Code of Conduct, applicable to all officers, directors and employees.

72.     Regarding "Board Risk Oversight," the 2020 Proxy Statement provided:

Our Board's oversight of risk management is designed to support the achievement of organizational objectives, including strategic objectives, to improve Equinix's long- term organizational performance and to enhance stockholder value. The involvement of the full Board in setting Equinix's business strategy is a key part of its assessment of what risks Equinix faces, what steps management is taking to manage those risks, and what constitutes an appropriate level of risk for Equinix. Our senior management attends the quarterly Board meetings, presents to the Board on strategic and other matters, and is available to address any questions or concerns raised about risk-management-related issues, or any other matters. Board members also have ongoing and direct access to senior management between regularly scheduled board meetings for any information requests or issues they would like to discuss. In addition, in Sept. 2019 the Board held a strategy meeting with senior management to discuss strategies, key challenges, and risks and opportunities for Equinix. The Board typically holds a meeting focused solely on strategy annually, to set the stage for the planning and development of Equinix's operating plan for the coming year.

Equinix has completed a global risk assessment to identify key strategic, operational, financial and regulatory compliance risks and will continue to evaluate such risks. These risks have been communicated to and assessed by Equinix's executive management, the Governance Committee and the full Board. The Board received an enterprise risk briefing in Sept. 2019 in connection with its strategy meeting and is scheduled to receive its next enterprise risk briefing in Sept. 2020. Additionally, in 2019 the full Board received a briefing on cybersecurity. Briefings on cybersecurity, as well as other enterprise risks, will also be provided in 2020.

73.     The 2020 Proxy Statement stated the following with respect to AFFO, in relevant part:

("AFFO"), which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items. In presenting AFFO, Equinix excludes certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

74.     On May 6, 2020, Equinix hosted an earnings conference call to discuss 1Q20 financial results. During the call, Defendant Taylor stressed that AFFO of $535 million was "above our expectations on a constant currency basis *due to strong operating performance and lower-than planned interest expense and income taxes*." When asked specifically about the "variability in maintenance CapEx[,]" Defendant Taylor responded:

Sure. Yes. We did see slightly less this quarter than we anticipated, roughly 1.2%. If I go to the same quarter last year, it was 1.5% of revenues. I mean certainly, as we're all aware during the latter part of the quarter, *things started to slow down a little bit.* We also were putting our IBXs into a more restricted fashion. No surprise as things took root in different parts of the world. But all that said, when you look at our overall guidance, we're still looking at somewhere around $150 million to $160 million of capital that will go into recurring and only a portion of that, of

course, is maintenance, roughly 2% of our recurring CapEx is maintenance. And
so you'll see it go back to a more traditional level in Q2. That's reflected in the
guidance. And then for the year, you'll see it. Roughly – a little bit lower than we
saw last year, but roughly in line with what our expectations would be on a go-
forward basis.

75.    On May 7, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for
the period ended March 31, 2020 (the "1Q20 Report"). Attached to the 1Q20 Report were
certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy
of financial reporting, the disclosure of any material changes to the Company's internal control
over financial reporting, and the disclosure of all fraud.

76.    The 1Q20 Report contained the following statement about the Company's internal
controls:

Our management, with the participation of our Chief Executive Officer and our
Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15
promulgated under the Securities Exchange Act of 1934, as amended (the
"Exchange Act"), of the effectiveness of our "disclosure controls and procedures"
as of the end of the period covered by this quarterly report. ***Based on this
evaluation, the Chief Executive Officer and Chief Financial Officer concluded
that the disclosure controls and procedures were effective as of the end of the
period covered by this quarterly report***.

77.    The 1Q20 Report contained the following statement regarding the "limitations on
the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial
Officer, believes that our disclosure controls and procedures and internal
control over financial reporting are designed and operated to be effective at the
reasonable assurance level***. However, our management does not expect that our
disclosure controls and procedures or our internal control over financial reporting
***will prevent all errors and all fraud***. A control system, no matter how well
conceived and operated, ***can provide only reasonable, not absolute, assurance
that the objectives of the control system are met***. Further, the design of a control
system must reflect the fact that there are resource constraints, and the benefits of
controls must be considered relative to their costs. ***Because of the inherent
limitations in all control systems, no evaluation of controls can provide absolute
assurance that all control issues and instances of fraud, if any, have been
detected***. These inherent limitations include the realities that judgments in decision
making can be faulty, and that breakdowns can occur because of a simple error or
mistake. ***Additionally, controls can be circumvented by the individual acts of
some persons, by collusion of two or more people or by management override of***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

78.     The 1Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

79.     The 1Q20 Report included the following statement on stock-based compensation:

*For the three months ended March 31, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 653,281 shares of restricted stock units to certain employees*, including executive officers, pursuant to the 2000 Equity Incentive Plan. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $579.24 and a weighted-average requisite service period of 3.31 years. The valuation of restricted stock units with only a service condition or a service and performance condition requires no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. *The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the three months ended March 31, 2020*.

80.     The 1Q20 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers *and ensure our IBX data centers and non-IBX offices remain operational at all times*. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:
- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment*

*damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

81.    On May 27, 2020, Defendant Meyers presented on behalf of the Company at the RBC Capital Markets Data Center & Connectivity Conference. During the conference, Defendant Meyers engaged in the following question-and-answer discussion with an analyst:

*Analyst*: [D]uring COVID, one naturally has to make trade-offs about what to do operationally with respect to maintenance CapEx, maintenance OpEx. . . . Has there been any of that kind of give and take at Equinix? And might we revert to kind of higher more normalized levels of maintenance CapEx once they come out the other side of the pandemic?

*Defendant Meyers*: Yes. Generally, I wouldn't say that that was really a factor for us in terms of affecting our maintenance costs and maintenance CapEx. Because, again, all of our sites remain fully staffed and operational. . . . I'm sure there were examples of maintenances that were pushed out or -- but not in any meaningful way. ***And Q1 was low for us, but I think it was more an artifact of one pull forward into Q4***, which is a common thing for us to do at the end of the year is to try to get those things pulled in if we can get them done in Q4 ***and then probably a little bit of things pushing out into Q2***. But I think we're, for the most part, going to trend towards our more common levels of recurring CapEx, which 3% to 5% annually. But Q1 is a seasonally low. It was 1.2%. I think that's probably at very low end. We'd expect a more normal level in Q2, which is more at the 3% level.

82.    On July 31, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 Report"). Attached to the 2Q20 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

83.    The 2Q20 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded***

*that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.*

84.    The 2Q20 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud.* A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met.* Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.* These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls.* The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.*

85.    The 2Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense

adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the dated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

86.    The 2Q20 Report included the following statement on stock-based compensation:

***For the six months ended June 30, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 680,543 shares of restricted stock units to certain employees***, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $583.99 per share and a weighted-average requisite service period of 3.33 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. ***The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the six months ended June 30, 2020***.

87.    The 2Q20 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage.* These could result from numerous factors, including:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures.* Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers *could also result in lost profits or other indirect or consequential damages to our customers*. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

88.    On October 30, 2020, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 Report"). Attached to the 3Q20 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

89.    The 3Q20 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

90.    The 3Q20 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

91.    The 3Q20 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense

adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

92.    The 3Q20 Report included the following statement on stock-based compensation:

***For the nine months ended September 30, 2020, the Compensation Committee and/or the Stock Award Committee of the Company's Board of Directors, as the case may be, approved the issuance of an aggregate of 709,450 shares of restricted stock units to certain employees***, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $593.74 per share and a weighted-average requisite service period of 3.30 years. The valuation of restricted stock units with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of the Company's stock price on the date of grant. ***The Company used revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the restricted stock units with both service and performance conditions that were granted in the nine months ended September 30, 2020***.

93.    The 3Q20 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers *could also result in lost profits or other indirect or consequential damages to our customers*. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our operating results*.

94.     On February 10, 2021, the Company hosted an earnings call with analysts and investors to discuss 4Q20 financial results. During the call, Defendant Taylor reported Q4 AFFO of $517 million, adding that the result was "meaningfully above our expectations on a constant currency basis due to strong operating performance *while absorbing seasonally higher recurring CapEx investments*, a similar scenario to prior years."

95.     On February 19, 2021, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Meyers, Taylor, Van Camp, Caldwell, Fox-Martin, Hromadko, and Paisley. Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of

37

any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

96.    The 2020 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). *Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020*.

97.    The 2020 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). *Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements*. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), *our management concluded that our internal control over financial reporting was effective as of December 31, 2020*.

98.    The 2020 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well

38

conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

99.    The 2020 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred

in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

100.    The 2020 Annual Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including:
- human error;
- *equipment failure*;
[. . .]
- *power loss*;
[. . .]

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

101.     On April 13, 2021, Equinix filed a proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement") wherein Defendants solicited in favor of numerous proposals, including the election or re-election of nine individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

102.     The 2021 Proxy Statement contained substantially similar statements regarding the Company's Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020 Proxy Statement.

103.     On April 28, 2021, the Company hosted an earnings conference call to discuss 1Q21 financial results. During the call, Defendant Taylor reported Q1 AFFO as $627 million, adding tha it was "meaningfully above our expectations *due to strong operating performance and lower seasonal recurring capital expenditures*."

104.     On April 30, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

105.     The 1Q21 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

106.     The 1Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the*

*reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

107.    The 1Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these

expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

108.    The 1Q21 Report included the following statement on stock-based compensation:

*For the three months ended March 31, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 646,388 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $650.40 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2021.*

109.    The 1Q21 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:

- human error;
- *equipment failure*;
  [. . .]
- *power loss;*

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers

1
2
3
4
5
6
7
8
9

*could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

110.    On July 28, 2021, Equinix hosted an earning conference call to discuss 2Q21 financial results. During the call, Defendant Taylor reported that Q2 AFFO was "$632 million, including a $25 million recurring CapEx increase compared to the prior quarter, *above our expectations due to strong operating performance and lower integration costs*."

111.    On July 30, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

112.    The 2Q21 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

113.    The 2Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud.* A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met.* Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.* These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls.* The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.*

114.    The 2Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract

45

costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

115.    The 2Q21 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 689,992 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.05 per share and a weighted-average requisite service period of 3.59 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2021*.

116.    The 2Q21 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safehouse our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:
- human error;
- *equipment failure*;
  [. . .]

- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

117.    On November 4, 2021, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

118.    The 3Q21 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

119.    The 3Q21 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal*

47

*control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

120.    The 3Q21 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the

amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

121.    The 3Q21 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2021, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, approved the issuance of an aggregate of 689,992 shares of restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.05 per share and a weighted-average requisite service period of 3.59 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues and adjusted funds from operations ("AFFO") per share as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2021*.

122.    The 3Q21 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:

- human error
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

49

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures.* Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

123.    On January 5, 2022, Defendant Meyers presented at the Citi AppsEconomy Conference on behalf of the Company. During the conference, Defendant Meyers discussed AFFO per share growth, stating in relevant part:

Well, I mean, to some degree, that's clearly the way we think about it, right, which is, hey, what do we need to do in terms of delivering margin expansion because in the end, we have to deliver the AFFO per share growth, right? And so – and because we serve – aren't going to get that below the line, then what we have to do is get good solid growth, and then we have to flow that through. And if we want to perform on the AFFO per share line, we have to continue to drive some level of operating leverage in the business.

124.    During a Company earnings call held February 16, 2022 to discuss 4Q21 and FY21 financial results, Defendant Taylor was asked what was driving years of the Company's CapEx being at the low end of its forecasted range. In response, Defendant Taylor stated:

And so just the recurring CapEx, we are at . . . sort of the lower end of the range for fiscal year '22, quite just timing, Nick. . . . And so you saw an elevated Q4 number at roughly 5% recurring CapEx relative to revenue. It steps down, of course, in Q1. And then as we look through the year, it is roughly somewhere between 2% and 3%. But I think the biggest thing is really about timing and a number of new assets that we're bringing into the portfolio. And as a result, when you think about the level of recurring CapEx that has to be made, the newer the portfolio, the better the position you have on recurring CapEx.

125.    On February 18, 2022, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by Defendants Meyers, Taylor, Van Camp, Caldwell, Fox-Martin, Hromadko, Paisley, and Rivera. Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

126.    The 2021 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021***.

127.    The 2021 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). ***Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements***. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

> Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), ***our management concluded that our internal control over financial reporting was effective as of December 31, 2021***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

128.    The 2021 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected*.

129.    The 2021 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

130.    The 2021 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:
> - human error;
> - ***equipment failure***;
>   [. . .]
> - ***power loss***;
>   [. . .]
>
> ***We have service level commitment obligations to certain customers***. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in

53

the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

131.    On April 12, 2022, Equinix filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement") wherein Defendants solicited in favor of numerous proposals, including the election or re- election of nine individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

132.    The 2022 Proxy Statement contained substantially similar statements regarding the Company's Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020 and 2021 Proxy Statements.

133.    On April 27, 2022, the Company hosted an earnings call with analysts and investors to discuss 1Q22 financial results. During the call, Defendant Meyers assured investors that Equinix would meet its AFFO guidance through top line growth and operating leverage, stating, in part: "And at the end of the day, that's really our lighthouse metric is driving that AFFO per share growth."

134.    On April 29, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

135.    The 1Q22 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures"

as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

136.    The 1Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

137.    The 1Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets,

accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

138.    The 1Q22 Report included the following statement on stock-based compensation:

*For the three months ended March 31, 2022, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 750,583 restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $665.53 per share and a weighted-average requisite service period of 3.50 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2022.*

139.    The 1Q22 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX

data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:

- human error;
- ***equipment failure***;
  [. . .]
- ***power loss***;
  [. . .]

**We have service level commitment obligations to certain customers**. As a result, service interruptions or significant equipment damage in our IBX data centers ***could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

140.    On May 23, 2022, Defendant Meyers appeared on behalf of the Company at the JPMorgan Global Technology, Media & Communications Conference. During the conference, Defendant Meyers stated that the Company's focus "is on long-term value creation, and ***that primarily is in the form of AFFO per share growth***. And so that's really our lighthouse metric."

141.    On July 29, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

142.    The 2Q22 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

143.    The 2Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

144.    The 2Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO

represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

145.    The 2Q22 Report included the following statement on stock-based compensation:

**For the six months ended June 30, 2022, the Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 794,013 restricted stock units ("RSUs") to certain employees**, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $663.94 per share and a weighted-average requisite service period of 3.51 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. **We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*with both service and performance conditions that were granted in the six months ended June 30, 2022*.

146.    The 2Q22 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage. These could result from numerous factors, including but not limited to:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

147.    On September 23, 2022, Barclays issued a report titled "Mounting Risks: Downgrading EQIX to Equal Weight. . . ." (the "Barclays Report"). The Barclays Report reasoned that Equinix was likely overstating AFFO, noting that the Company's recurring CapEx averaged 8.7% of revenue before the transition to a REIT, but dropped to just 3.6% of revenue afterward. Specifically, the Barclays Report stated, in relevant part:

Investor attention has recently focused on earnings quality, and specifically how maintenance and and [sic] growth capex are allocated. *As AFFO is a non-GAAP*

*number, our sense is management teams have a fair amount of discretion in how the spending is characterized*. This is particularly relevant because REITs deduct maintenance capex from FFO when calculating AFFO, but not growth capex. (EQIX specifically uses the labels "recurring vs. non-recurring" capex, instead of "maintenance vs. growth" but we see no material difference in the definitions). In the three years prior to becoming a REIT (2012-2014), EQIX's recurring capex averaged 8.7% of revenue (during this period EQIX used the term "ongoing" capex, but again no material difference in definition). Since 2015 when the company filed as a REIT, recurring capex as averaged 3.6%.

148.    The Barclays Report also reasoned that there was no "plausible reason" for Equinix's change in the methodology for classifying CapEx after 2014, other than to inflate AFFO, stating in relevant part:

We acknowledge the capex growth and CabE CAGR comparison is complicated by the net purchase of assets since 2014, but that would also increase the cabinet total, all else equal. Management suggests it is expensing ~3% of revenue on maintenance, in addition to the ~3% of revenue accounted for as maintenance capex in AFFO. Still, we do not see a plausible reason why capex accounting changed after 2014, other than to reflect higher AFFO.

149.    On this news, Equinix's stock price declined by approximately 2.6%, from $609.26 on September 22, 2022, to $593.13 on September 23, 2022.

150.    On November 2, 2022, Equinix hosted an earnings conference call to discuss 3Q22 financial results. During the call, Defendant Meyers reported that adjusted EBITDA was up 11% year-over-year, with "*AFFO meaningfully ahead of our expectations due to strong operating performance*."

151.    On November 4, 2022, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

152.    The 3Q22 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the

"Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

153.    The 3Q22 Report contained the following statement regarding the "limitations on the effectiveness of controls":

***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

154.    The 3Q22 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO

62

excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

155. The 3Q22 Report included the following statement on stock-based compensation:

***For the nine months ended September 30, 2022, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 856,959 restricted stock units ("RSUs") to certain employees***, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $661.64 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant ***We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the nine months ended September 30, 2022***.

156. The 3Q22 Report contained the following disclosure regarding infrastructure risk:

***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX

data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]

***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:

- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

157.    On January 4, 2023, Defendant Meyers appeared at the Citi Communications, Media & Entertainment Conference on behalf of the Company. During the conference, Defendant Meyers stated, in relevant part:

I will say this in terms of giving you a little more concrete answer on that, ***we clearly*** see operating leverage as one fundamental element of driving AFFO per share growth, which we view as the lighthouse metric for our business. Because at the end, I think investors see it and say, "Look, what do I get in terms of dividend yield and what are you going to give me on AFFO per share", right? And so that's fundamentally our people. And we very – we have that very deeply ingrained into our thinking about how we run the business.

158.    On February 17, 2023, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 Annual Report").[2] The 2022 Annual Report was signed by Defendants Meyers, Taylor, Van Camp, Caldwell, Fox-Martin, Hromadko, Paisley, River, Olinger, Patel, and Russo. Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

159.    The 2022 Annual Report contained the following statement about the Company's internal controls:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2022***.

160.    The 2022 Annual Report further provided the following management report on internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). ***Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements***. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

---

[2] The amended 2022 10-K, filed on form 10-K/A on February 27, 2023, did not change the statements referenced herein.

Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), ***our management concluded that our internal control over financial reporting was effective as of December 31, 2022***.

161.    The 2022 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

162.    The 2022 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions,

restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

163.    The 2022 Annual Report contained the following disclosure regarding infrastructure risk:

> ***Our business depends on providing customers with highly reliable solutions***. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX offices remain operational at all times. [. . .]
>
> ***Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage***. These could result from numerous factors, including but not limited to:
> - human error;
> - ***equipment failure***;
>   [. . .]
> - ***power loss***;
>   [. . .]
>
> ***We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures***. Because our IBX data

centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). ***In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations***.

164.    On March 6, 2023, Defendant Meyers appeared on behalf of the Company at the Citi Miami Global Property CEO Conference. Defendant Meyers stated that the "***lighthouse metric for us is AFFO per share***. That combined with dividend yield is what we think is the value creation engine for investors. ***And so that's what we're really focused on***."

165.    On April 12, 2023, Equinix filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement") wherein Defendants solicited in favor of numerous proposals, including the election or re-election of eleven individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Olinger, Paisley, Patel, Rivera, Russo and Van Camp.

166.    The 2023 Proxy Statement contained substantially similar statements regarding the Company's Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020, 2021, and 2022 Proxy Statements.

167.    On May 2, 2023, Equinix hosted an earnings conference call to discuss 1Q23 financial results. During the call, Defendant Taylor reported that Q1 AFFO was $802 million, "above our expectations ***due to strong business performance***, including lower net interest expense and income taxes."

168.    On May 5, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

169.    The 1Q23 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report***.

170.    The 1Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> ***Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level***. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting ***will prevent all errors and all fraud***. A control system, no matter how well conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

171.    The 1Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

69

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

172.    The 1Q23 Report included the following statement on stock-based compensation:

***For the three months ended March 31, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 845,473 restricted stock units ("RSUs") to certain employees***, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $685.99 per share and a weighted-average requisite service period of 3.48 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for

70

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the three months ended March 31, 2023*.

173.    The 1Q23 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:

- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations.*

174.    On August 2, 2023, the Company hosted an earnings conference call to discuss 2Q23 financial results. During the call, Defendant Taylor reported "Global Q2 AFFO was $754 million, above our expectation due to strong business performance and lower net interest expense." In response to an analyst's question asking whether there was "anything notable to be

aware" with regards to the Company's higher recurring CapEx guidance, Defendant Taylor stated, in relevant part:

> *As it relates -- no, there's a little bit more recurring CapEx. When we have capacity and we look across the portfolio and think what can we do based on the capacities we have.* And so sometimes when we work with Rob Abdel's organization said, we have capacity to put a little bit more recurring CapEx into the year. And so what you could do is pull it forward from 1 year and put it into the year prior. And so that's what you've just seen. We have -- *we felt we had a little bit more capacity to invest in some recurring CapEx this year.* That really takes away that obligation for next year.

175.    On August 4, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2023 (the "2Q23 Report"). Attached to the 2Q23 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

176.    The 2Q23 Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.*

177.    The 2Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

> *Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level.* However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud.* A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met.* Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent*


*limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. *Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected*.

178. The 2Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and non-controlling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

179.    The 2Q23 Report included the following statement on stock-based compensation:

*For the six months ended June 30, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 891,561 restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $690.63 per share and a weighted-average requisite service period of 3.45 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the six months ended June 30, 2023*.

180.    The 2Q23 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

*Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:

- human error;
- equipment failure;
  [. . .]
- power loss;
  [. . .]

*We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

181.    On October 25, 2023, Equinix held its 3Q23 earnings conference call, during which Defendant Taylor reported that "Global Q3 AFFO was $772 million, *above our expectations due to strong business performance and timing of recurring CapEx spend*."

182.    On October 27, 2023, Equinix filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "3Q23 Report"). Attached to the 3Q23 Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

183.    The 3Q23 Report contained the following statement about the Company's internal controls:

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of the effectiveness of our "disclosure controls and procedures" as of the end of the period covered by this quarterly report. *Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this quarterly report*.

184.    The 3Q23 Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well

conceived and operated, ***can provide only reasonable, not absolute, assurance that the objectives of the control system are met***. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. ***Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected***. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. ***Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls***. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected***.

185.    The 3Q23 Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and non-controlling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the condensed consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it

generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current future operating performance.

186.    The 3Q23 Report included the following statement on stock-based compensation:

*For the nine months ended September 30, 2023, the Talent, Culture and Compensation Committee and/or the Stock Award Committee of our Board of Directors, as the case may be, granted an aggregate of 943,224 restricted stock units ("RSUs") to certain employees*, including executive officers. These equity awards are subject to vesting provisions and have a weighted-average grant date fair value of $694.34 per share and a weighted-average requisite service period of 3.52 years. The valuation of RSUs with only a service condition or a service and performance condition require no significant assumptions as the fair value for these types of equity awards is based solely on the fair value of our stock price on the date of grant. *We use revenues, adjusted funds from operations ("AFFO") per share and digital services revenues as the performance measurements in the RSUs with both service and performance conditions that were granted in the nine months ended September 30, 2023*.

187.    The 3Q23 Report contained the following disclosure regarding infrastructure risk:

*Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]

Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage. These could result from numerous factors, including but not limited to:

- human error;
- *equipment failure*;
  [. . .]
- *power loss*;
  [. . .]

*We have service level commitment obligations to certain customers*. As a result, service interruptions or significant equipment damage in our IBX data centers *could result in difficulty maintaining service level commitments to these*

*customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

188.    On February 14, 2024, during an earnings conference call, Defendant Meyers explained that "the benefits of efficiency investments over the past few years" allowed the Company to, among other things, "expand margins and deliver outsized performance on AFFO per share, which we continue to see as our lighthouse metric and the bedrock of long-term value creation." During the same call, Defendant Taylor reported that Q4 AFFO was "$691 million, *above our expectations due to strong business performance and favorable interest income*, offset in part by higher seasonal recurring CapEx."

189.    On February 16, 2024, Equinix filed with the SEC its annual report on Form 10-K for the period ended December 31, 2023 (the "2023 Annual Report"). The 2023 Annual Report was signed by Defendants Meyers, Taylor, Van Camp, Caldwell, Fox-Martin, Hromadko, Olinger, Paisley, Patel, Rivera, and Russo. Attached to the 2023 Annual Report were certifications pursuant to SOX signed by Defendants Meyers and Taylor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

190.    The 2023 Annual Report contained the following statement about the Company's internal controls:

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as

amended (the "Exchange Act"). *Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2023*.

191.    The 2023 Annual Report further provided the following management report on internal control over financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). *Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements*. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on our evaluation under the framework in *Internal Control – Integrated Framework* (2013), *our management concluded that our internal control over financial reporting was effective as of December 31, 2023*.

192.    The 2023 Annual Report contained the following statement regarding the "limitations on the effectiveness of controls":

*Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed and operated to be effective at the reasonable assurance level*. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting *will prevent all errors and all fraud*. A control system, no matter how well conceived and operated, *can provide only reasonable, not absolute, assurance that the objectives of the control system are met*. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. *Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected*. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. *Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls*. The design of any system of controls is also based in part upon certain

assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. ***Because of the inherent limitations in a cost effective control system, misstatements due to error or fraud may occur and not be detected***.

193.    The 2023 Annual Report contained the following statement about adjusted funds from operations, or "AFFO":

> We use FFO and AFFO, which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items.

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, stock-based charitable contributions, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items. The adjustments for installation revenue, straight-line rent expense and contract costs are intended to isolate the cash activity included within the straight-lined or amortized results in the consolidated statement of operations. We exclude the amortization of deferred financing costs and debt discounts and premiums as these expenses relate to the initial costs incurred in connection with debt financings that have no current or future cash obligations. We exclude gain (loss) on debt extinguishment since it generally represents the write-off of initial costs incurred in connection with debt financings or a cost that is incurred to reduce future interest costs and is not a good indicator of our current or future operating performance. We include an income tax expense adjustment, which represents the non-cash tax impact due to changes in valuation allowances, uncertain tax positions and deferred taxes that do not relate to the current period's operations. We deduct recurring capital expenditures, which represent expenditures to extend the useful life of IBX data centers or other assets that are required to support current revenues. We also exclude net income (loss) from discontinued operations, net of tax, which represents results that may not recur and are not a good indicator of our current or future operating performance.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

194.    The 2023 Annual Report contained the following disclosure regarding infrastructure risk:

> *Our business depends on providing customers with highly reliable solutions*. We must safeguard our customers' infrastructure and equipment located in our IBX data centers and ensure our IBX data centers and non-IBX business operations remain operational at all times. [. . .]
>
> *Problems at one or more of our IBX data centers or corporate offices, whether or not within our control, could result in service interruptions or significant infrastructure or equipment damage*. These could result from numerous factors, including but not limited to:
> - human error;
> - *equipment failure*;
>   [. . .]
> - *power loss*;
>   [. . .]
>
> *We have service level commitment obligations to certain customers. As a result, service interruptions or significant equipment damage in our IBX data centers could result in difficulty maintaining service level commitments to these customers and potential claims related to such failures*. Because our IBX data centers are critical to many of our customers' businesses, service interruptions or significant equipment damage in our IBX data centers could also result in lost profits or other indirect or consequential damages to our customers. We cannot guarantee that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as a result of a problem at one of our IBX data centers and we may decide to reach settlements with affected customers irrespective of any such contractual limitations. Any such settlement may result in a reduction of revenue under U.S. generally accepted accounting principles ("GAAP"). *In addition, any loss of service, equipment damage or inability to meet our service level commitment obligations could reduce the confidence of our customers and could consequently impair our ability to obtain and retain customers, which would adversely affect both our ability to generate revenues and our results of operations*.

195.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, the Individual Defendants caused the Company to fail to disclose that: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations;

(ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls.

196.    The 2020, 2021, 2022, and 2023 Proxy Statements failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

197.    The 2020, 2021, 2022, and 2023 Proxy Statements further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting. The false and misleading elements of the 2020, 2021, 2022, and 2023 Proxy Statements were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors.

## THE TRUTH BEGINS TO EMERGE

198.    On March 20, 2024, *Hindenburg Research* ("Hindenburg") released a report on Equinix entitled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling an AI Pipe Dream As Insiders Cashed Out Hundreds of Millions" (the "Hindenburg Report" or the "Report").

199.    The Hindenburg Report contained a slew of allegations against the Company, which can be broadly summarized as follows:

- Equinix manipulates its profit margin and its AFFO by misclassifying typical operational expenses (such as replacing lightbulbs and batteries), or maintenance CapEx, as growth CapEx;

- Equinix has relied on an undisclosed and highly risky approach to grow its revenue—overselling power capacity in the hope that the customer will not use all of the power, which could result in facility outages and a failure to fulfill contractual obligations.

200.    The Hindenburg Report provided the following background information on the Company:

In 2015, Equinix converted [ . . . ] to a REIT, a tax-advantaged structure that must distribute most of its income to its investors. Immediately following this change, the company reported a spike in reported growth CapEx (called 'non-recurring CapEx') on the company's balance sheet and a withering of reported spending on maintenance CapEx (called 'recurring CapEx'). ***That shift has sustained Equinix's stellar non-GAAP AFFO metric and enriched its top executives.***

For 10 years, investors have been either unaware of or have given Equinix the benefit of the doubt regarding this shift, convinced that the company has transformed much of its routine maintenance spending into an activity that simultaneously generates more capacity to expand its business.

201.    Hindenburg further stated that "[in 2015], Equinix's executive incentive plan and long-term performance compensation plan replaced adjusted EBITDA as a key metric with AFFO[.]"

202.    Hindenburg stated the following regarding its findings into how Equinix has raised its reported AFFO over a multi-year period:

Our research, however, found that this sustained rise in reported AFFO, driven by shrinking reported maintenance CapEx, is more financial engineering than *actual* engineering.

Our investigation involved interviewing 37 former Equinix employees, industry experts and competitors, along with reviewing financial statements and litigation records.

Our investigation found that Equinix (i) bases its executive bonus compensation on the company's AFFO metric (ii) then manipulates its accounting for maintenance CapEx to overstate this AFFO figure, resulting in the illusion of vastly higher AFFO, higher executive bonus compensation and an inflated stock price.

203.    The Hindenburg Report then noted that "[s]ince one of Equinix's main costs is maintaining and repairing its data centers, maintenance CapEx [. . .] is a critical factor in determining the company's AFFO. ***In short, the lower maintenance CapEx Equinix reports, the higher its AFFO will be***."

204.    The Report stated the following on how REIT investors, as part of the investment process, depend on a REIT to accurately distinguish between maintenance CapEx and growth CapEx:

> REIT investors rely on companies to accurately account for the split between maintenance CapEx and growth CapEx to assess the profitability of a company's current operations and its financial commitment to future growth initiatives. ***If a REIT were to inappropriately shift maintenance CapEx into growth CapEx, it would inflate reported current profitability while giving investors the false impression that it is heavily investing into anticipated growth***.

205.    After the 2015 switch from adjusted EBITDA to AFFO as the key metric to determine executive compensation, Hindenburg noted that the Company's reported maintenance CapEx (which would need to be lower to boost AFFO) "plummeted by 47% to $120.3 million, or 4.4% of total revenue, according to the company's annual report." Maintenance CapEx as a percentage of revenue has been low ever since.

206.    Hindenburg then demonstrated that maintenance CapEx has been lower in the years since the Company's 2015 conversion to a REIT, and the corresponding switch to AFFO as the key metric to determine executive compensation and the Company's overall health.

207.    The Hindenburg Report then discussed maintenance costs at Equinix. Specifically, it stated that "[g]enerally, as physical assets like data centers get older, maintenance costs increase." Further, Hindenburg quoted an engineer who worked at Equinix's Secaucus, New Jersey data center (built in 2006) as saying "you would be amazed at the amount of equipment that goes offline, needs to be repaired."

208.    The Report then stated that "[c]ontrary to this basic physical reality, Equinix's maintenance CapEx significantly *declined* as a percentage of revenue over the past decade, from 9.3% in 2014 to 2.7% in 2023, despite its facilities aging."

209.    Next, Hindenburg discussed how top-down pressure is placed on Equinix employees to classify expense items as growth CapEx, and not maintenance CapEx. The Report stated that "[a] former executive we interviewed explained that accounting teams headed by the

Chief Accounting Officer were pressured by management to classify as much CapEx as expansion (growth CapEx) as possible[.]"

210.    Next, the Hindenburg Report provided examples of how maintenance CapEx is shifted to growth CapEx.

211.    First, the Report discussed chillers, which were described as a "key piece of data center equipment that helps regulate temperature." The Report discussed how a "former Equinix director" revealed how "the company would obtain new serial numbers for refurbished chillers so it could then be accounted for as a 'new' item post-repair, and sometimes recognized as growth CapEx." That employee was quoted as saying the following:

> Chillers are touch …Chillers stay in place. You don't replace chillers. All you do is rebuild them. There's been some debate on this. What happens and what you work towards is you do a chiller overhaul. And you'd work with your chiller vendor to give you a new serial number on the unit.

212.    The same former employee said that "[a] new serial number with the unit, for all intents and purposes, looks, talks, walks like a brand new installation." The same individual said that the practice was "really on the edge" of growth CapEx classification, that on occasion, accounting teams didn't review the descriptions of the chiller expenditures, in order to lump the expenses into growth CapEx spending, in order to boost AFFO.

213.    The Report then discussed how Equinix would improperly classify routine replacements in its data centers as growth CapEx spending, in order to boost its AFFO.

214.    The Report first focused on how the Company categorized routine battery replacements as growth CapEx spending. The Report first explained that "[i]n data centers, batteries are essential [. . .] to the uninterruptible power supply (UPS), an automated back-up system that can be switched to instantly in case of power issues. UPS batteries are a major replacement cost in any data center, former employees explained to us."

215.    The Report quoted a former operations manager, who managed multiple data centers, as saying "[y]ou're always doing batteries. Someplace, somehow, some way, you're always doing batteries." The Report quoted a former executive as saying "[o]ne of the biggest

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ones [maintenance costs], obviously, is the batteries. You've got millions of batteries sitting there."

216.    Another former executive was quoted as saying the following about the costs of batteries:

> This is the largest expense in a data center. Battery replacement. That sucks. That is just money leaving your pocket...It sat there, hopefully did nothing for its lifetime, just sat there getting charged. You never had to use them and then you just replace them.

217.    The Report then said the "former operations director told us that Equinix would classify routine battery replacements as growth CapEx by characterizing this activity as replacing a 'battery *system*'", which had the effect of boosting the Company's AFFO metric. The former operations director specifically said the following:

> So replacing a battery system is a capital improvement. Non-recurring...As long as it's part of that, as long as you replace the entire battery system, ***All you do is replace the batteries within the cabinets. And that's considered the system***."

218.    The Hindenburg Report then discussed lightbulbs. It stated that "[m]ost companies ***wouldn't view an activity as mundane as changing light bulbs to be a catalyst for growth. The created accounting minds at Equinix apparently see things differently***." The Report quoted a "former senior Equinix operations manager", who described changing lightbulbs as a routine, daily operation. This former employee stated the following:

> You would be surprised how quick these light bulbs blow on this. Thousands of them. Right. So part of the daily inspections is to look at areas where the light bulbs are blown.

219.    Even in this situation, the Report noted, the Company "found 'creative' ways to book things like basic lightbulb replacements as growth CapEx. It quoted a former operations director as saying "[s]ay you changed out fluorescents to LED light bulbs, that's a capital improvement. ***You're not replacing lightbulbs, you're enhancing***."

220.    The Report then included the following exchange between a former Company employee and a Hindenburg researcher:

> **Former Employee**: Say you have a facility. You need to change light bulbs...Or you had to change all the ballasts in your light fixtures because they were just at

86

age. Which is costly. You need an electrician to come in to take it down. You need to unwire it and rewire it. ***Now, if you were to go back in and now convert those fl[u]orescent bulbs or systems with the ballast and the bulbs to an LED light, now you're performing an 'energy efficiency project'***."

**Hindenburg Researcher**: And that can be a non-recurring capital expenditure?

**Former Employee**: Correct. Absolutely.

221.    The Report then noted that a former Equinix finance director had "expressed surprised" that Hindenburg had found out about the Company's practices regarding classifying lightbulbs, but then acknowledged that "[t]his is ***one of the tricks*** that the operations teams use ***to say, well, this is not ongoing. This is non-recurring CapEx.***"

222.    Hindenburg further discussed Equinix's operating margins compared to its peers. It noted the following:

In 2023, Equinix reported [. . .] a 17.6% operating margin, almost double the 9.5% margin reported [. . .] by its closest peer, Digital Realty. The margins imply that Equinix is vastly more profitable [. . .], therefore justifying a higher stock multiple.

Former employees told us that those abnormally high operating margins were engineered with more accounting trickery. In addition to misclassifying CapEx between maintenance and growth, management pressured employees to **push operating expenses ("OpEx") into CapEx, sometimes regardless of the nature of the spend**.

223.    The Report noted that "[r]eclassifying operating expenses as CapEx to boost profitability metrics ***is a notorious accounting trick and was at the center of the WorldCom scandal*** [. . .] in the early 2000s, in perhaps the best-known example."

224.    The Report discussed how the accounting department at Equinix would, in many cases, pressure employees from other parts of the Company to reclassify operating expenses as CapEx. The Report quoted a former data center manager as saying that the accounting department viewed operational expenses as "dirty spend" and would pressure teams to book expenses as CapEx.

225.    On this issue, the Report said that "[o]ther former employees also described pressure to push operating expenses into CapEx from different teams within Equinix." It then listed the following employees:

- "One former data center manager said they felt squeezed by 'operationally focused accountants'". The Report quoted this former employee as saying "[t]hey would assess all our expenses versus our recurring CapEx... [They were] always trying to squeeze your expenses, your OpEx, because it was 'dirty spend.'"
- "A finance director told us teams were overseen by 'accounting watchdogs', the accounting team who tried to curtail operating expenses". The Report quoted this former employee as saying "[y]ou know, you have these accounting watchdogs there to basically try to keep the floodgates tight." This individual also said "[t]hey [operating teams] have a lot of pressure on the operating budget. So, the operating cost and then they try to squeeze stuff that is kind of gray into the CapEx area and move it out of the OpEx area."
- The Report quoted a former M&A manager, who reportedly directly interacted with a finance lead on projects, as saying that "[t]hey [the project's experts] asked me to do every machination to try to make a CapEx versus OpEx."

226.    The Report further stated that, according to a former director, "Equinix would press vendors to create unique SKUs ["stock keeping unit"] to lump basic operating costs into larger purchases, then record it as CapEx[.]" This former director stated, "[s]o you can look for, even as far as buying tool sets. So one might not qualify. ***But if you go over a certain threshold and you buy a set of them, maybe five of them… that'll count towards your CapEx.***"

227.    This former director further disclosed that Equinix would ask vendors to create new SKUs:

You can also work with your vendors, your suppliers and create unique SKUs. So if I was going to buy a tool set that was say $500, right. Hand a single SKU… Initially that would be considered OpEx. But if you went to your vendor and you said, 'hey, why don't you create a SKU with a five pack of those tool kits and get me a $2,500?' Now it's CapEx."

228.    That former director further stated "it's very easy to talk to your vendors and say, 'hey, can you create a new SKU?' Who's going to turn down business for that? It's just as easy for them to turn that around."

229.    The Company would also "use the wording of the project to make it sound like a capital improvement." A former director said that "[t]he other way, what happens is basically wording in such a way that it sounds like a capital improvement. You can get very creative with language."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

230.    Further, Equinix lumps smaller expenses together in order to book them as CapEx. The Report quoted a former executive as saying "[o]ftentimes, people or groups would try to bundle things to make sure that they were capitalized." In addition, a "senior leader" stated "[i]f it was over a certain dollar amount, which it typically was, it would have been treated as a non-recurring CapEx… It tended to change. I believe ours was in the $10,000 range. Which that wasn't actually a very big check."

231.    The Report included the following exchange:

**Hindenburg Researcher**: Was it written up as a threshold of everything below was operating expense and therefore above you could capitalize?

**Former Executive**: Yes. Oftentimes, people or groups would try to bundle things to make sure that they were capitalized."

232.    The Report quoted two former employees as saying that $2,500 and $3,000 were their respective minimums to categorize expenses as CapEx.

233.    One of these former employees confirmed that expense items could be capitalized merely by bundling them together, saying "[i]f you just buy one of them it has to be expensed then immediately…So and sometimes you can actually capitalize these things if they are purchased in bulk, life if you buy, for instance, 20 cabinets in one go, then you can capitalize them."

234.    The Hindenburg Report stated that the accounting manipulations used to boost AFFO "result in reported metrics that defy logic." It specifically referred to recurring capital expenditures of $14.5 million in Q1 2020, and projected recurring CapEx of $14-34 million for the first quarter of 2024, despite the fact that Equinix now operates 260 data centers and had 51 data centers in Q1 2010.

235.    The Hindenburg Report questioned Equinix's reported growth CapEx, given that its billed cabinet growth slowed in 2023. The Report stated the following:

Another widely-watched metric that *should* have some relation to growth CapEx *is the growth of cabinets*, the [physical enclosed areas] that data centers offer to clients. In its Q3 2023 investor call, the CEO mentioned [. . .] *the importance of the metric, saying it would "have to be a part of the growth story over time"*.

*Given this, one might expect that with Equinix's massive claimed growth CapEx, billed physical cabinet metrics would be growing quickly along with it.*

However, while reported growth CapEx stood at all-time highs in 2023, *year-on-year billed cabinet growth fell from 14.8% in 2018 to 1.7% in 2023*.

236.    Next, the Report discussed how "Equinix's questionable AFFO accounting has substantially contributed to $295.8 million in stock award grants to top executives." Hindenburg quoted a "former executive" as stating that "[t]here's every incentive to categorize as much as you can as expansion [growth] CapEx."

237.    It then stated that "[a]s noted earlier, in 2015, Equinix changed [. . .] its executive compensation plan to specifically reward AFFO growth, *with 50% of annual incentive pay weighted toward AFFO* and 50% to revenue[.]" (Emphasis added). Further, the Report stated that "AFFO has been a key metric in executive performance awards in every year since then." In 2022, the Report stated that "AFFO per share still remained *one of the key metrics considered in Annual Incentive and Long Term Performance Incentives*."

238.    The Report stated that "[a]s a result, since 2015, senior executives have been awarded ~ $295.8 million in cumulative stock awards, with stock awards rising almost every year."

239.    Hindenburg stated that "[a] former executive told us this compensation policy incentivized executives to push the boundaries on CapEx classification", and quoted that former executive as saying "[y]ou're being valued off and you know your executive comp[ensation] is tied to AFFO per share. *There's every incentive to categorize as much as you can as expansion [growth] CapEx…they're making that case for every questionable piece of CapEx.*"

240.    In summary, the Report stated, "by *reducing reported maintenance CapEx and inflating accounting metrics like AFFO*, Equinix executives *have ensured they personally benefit* from their accounting manipulations."

241.    The Report then detailed how the Company oversells power capacity, a risky strategy, in order to boost revenue growth:

As Equinix's accounting has worked to classify operating expenses and maintenance CapEx as growth CapEx, our research shows the company has perennially underinvested in actual growth infrastructure.

*Instead, it has quietly relied on a risky approach to growing revenue: overselling power capacity in the hope that customers won't increase their usage up to the power they've contracted for.*

242.    The Report said that "[t]he ***idea is that Equinix can oversell power in the hope that customers don't grow into their contracted levels***, a balancing act that can work if customer power usage rates don't increase." The Report stated that, as per former employees, "***Equinix doesn't have enough power at some of its facilities to satisfy its current customer contracts***[.]"

243.    The Report quoted a former executive as saying that "[m]ost Equinix data centers are what they call over-utilized anywhere from 120 to 175% of power" and that "[t]hey're double selling the power as well. The whole thing is like a little bit of a shell game."

244.    This strategy is risky. The Report stated that "[a] former executive confirmed the risks of overselling power ***include facility outages and a failure to fulfil contractual obligations***." This former executive further stated that "***it would be a very significant reputational challenge to mend I think in order to explain why suddenly you sold capacity you didn't have***."

245.    The Report then highlighted a litigation matter where Equinix failed to provide the customer the power that it was contractually obligated to provide:

Taking these risks [in reference to overselling capacity] hasn't always worked out. ***Equinix's failure to provide sufficient power was the subject of at least one customer lawsuit***. In December 2021, Blade Global alleged that it paid over $1 million to Equinix to secure space and power, but when it came to use the space, Equinix acknowledged that its "servers would require more CFM [(which Hindenburg stated meant "cubic feet per meter")] of cooling than its New York facility could provide.

246.    The Report then stated that this issue presents an increasingly serious risk to the Company, given that data center power demand usage is projected to go up over time, as a result of the increasing use of machine learning and artificial intelligence.

247.    On this news, the price of Equinix stock fell by $19.70 a share, or 2.33%, on March 20, 2024, to close at $824.88. The next day, it fell a further $13.24, or 1.6%, to close at $811.64.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

248.     Then, on March 25, 2020, before the market opened, the Company filed with the SEC a current report on Form 8-K. Attached to this current report was a press release which stated the following, in pertinent part:

> [T]he Audit Committee of the company's Board of Directors **has commenced an independent investigation to review the matters referenced in a recent short seller report**. Shortly after the release of the report, **the company received a subpoena from the U.S. Attorney's Office for the Northern District of California**. Receipt of these types of inquiries is not unusual in these circumstances, and Equinix intends to fully cooperate in this matter. The company does not expect to comment further on such matters until appropriate to do so.

249.     On this news, the price of Equinix stock fell by $8.45 per share, or 1.05%, to close at $792.52 on March 25, 2024.

## DAMAGES TO EQUINIX

250.     As a direct and proximate result of the Individual Defendants' misconduct, Equinix has expended and will continue to expend many millions of dollars.

251.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

252.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

253.     As a direct and proximate result of the Individual Defendants' conduct, Equinix has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

254.     Plaintiff brings this action derivatively in the right of and for the benefit of Equinix to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual

Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

255.    Equinix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

256.    Plaintiff is an owner of Equinix stock and has been a continuous shareholder of Company stock at all relevant times.

257.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

258.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following ten individuals: Defendants Meyers, Fox-Martin, Caldwell, Hromadko, Olinger, Paisley, Patel, Rivera, Russo, and Van Camp (the "Director Defendants"). Plaintiff is required to show that a majority of the current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

259.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

260.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

261.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

262.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

263.    Additional reasons that demand on Defendant Meyers is futile follow. Defendant Meyers has served as a Company director since 2018 and as the Executive Chairman of the Board since June 2024. Thus, as the Company admits in the 2024 Proxy Statement, Defendant Meyers is a non-independent director. The Company provided Defendant Meyers with his principal occupation for several years for which he received significant compensation as detailed above. Defendant Meyers authorized his signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Meyers is a defendant in the Securities Class Action and thus, faces potential liability. For these reasons, Defendant Meyers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

264.    Additional reasons that demand on Defendant Fox-Martin is futile follow. Defendant Fox-Martin has served as a Company director since 2020 and as the Company's CEO and President since June 2024. Thus, as the Company admits in the 2024 Proxy Statement, Defendant Fox-Martin is a non-independent director. The Company provides Defendant Fox-Martin with her principal occupation for which she receives significant compensation as detailed above. Defendant Fox-Martin authorized her signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Fox-Martin breached her fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

265.    Additional reasons that demand on Defendant Caldwell is futile follow. Defendant Caldwell has served as a Company director since 2015. The Company provides Defendant Caldwell with significant compensation as detailed above. Defendant Caldwell authorized her signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Caldwell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

266.    Additional reasons that demand on Defendant Hromadko is futile follow. Defendant Hromadko has served as a Company director since 2003. The Company provides Defendant Hromadko with significant compensation as detailed above. Defendant Hromadko authorized his signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hromadko breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

267.    Additional reasons that demand on Defendant Olinger is futile follow. Defendant Olinger has served as a Company director since 2011. The Company provides Defendant Olinger with significant compensation as detailed above. Defendant Olinger authorized his signature on the 2022 and 2023 Annual Reports, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Olinger breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

268.    Additional reasons that demand on Defendant Paisley is futile follow. Defendant Paisley has served as a Company director since 2007. The Company provides Defendant Paisley with significant compensation as detailed above. Defendant Paisley authorized his signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Paisley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

269.    Additional reasons that demand on Defendant Patel is futile follow. Defendant Patel has served as a Company director since 2022. The Company provides Defendant Patel with significant compensation as detailed above. Defendant Patel authorized his signature on the 2022 and 2023 Annual Reports, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Patel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

270.    Additional reasons that demand on Defendant Rivera is futile follow. Defendant Rivera has served as a Company director since 2019. The Company provides Defendant Rivera with significant compensation as detailed above. Defendant Rivera authorized her signature on the 2019, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Rivera breached her fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

271.    Additional reasons that demand on Defendant Russo is futile follow. Defendant Russo has served as a Company director since 2022. The Company provides Defendant Russo with significant compensation as detailed above. Defendant Russo authorized her signature on the 2022 and 2023 Annual Reports, both of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Russo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

272.    Additional reasons that demand on Defendant Van Camp is futile follow. Defendant Van Camp has served as a Company director since 2000 and served as the Board's Executive Chairman from 2007 until June 2024. Thus, as the Company admits in the 2024 Proxy Statement, Defendant Van Camp is a non-independent director. The Company provides Defendant Van Camp with significant compensation as detailed above. Defendant Van Camp authorized his signature on the 2019, 2020, 2021, 2022, and 2023 Annual Reports, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Van Camp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

273.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

274.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

275.    Publicly traded companies, such as Equinix, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

276.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

## COUNT ONE

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

277.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

278.    The Director Defendants solicited the 2024 Proxy Statement containing materially false and misleading statements and/or omissions.

279.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

280.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

281.    Under the direction and watch of the Director Defendants, the 2020, 2021 2022, and 2023 Proxy Statements failed to disclose that: (i) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (ii) the Board failed to adequately carry out its risk management and oversight obligations and failed to adhere to the Code of Conduct.

282.    The 2024 Proxy Statement also failed to disclose that: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls.

283.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020, 2021, 2022, and 2023 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

284.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2020, 2021, 2022, and 2023 Proxy Statements.

285.    Plaintiff on behalf of Equinix has no adequate remedy at law.

## COUNT TWO

**Against the Individual Defendants for Breach of Fiduciary Duties**

286.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

287.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Equinix's business and affairs.

288.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

289.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Equinix.

290.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

291.    In further breach of their fiduciary duties owed to Equinix, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls.

292.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such

100

facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

293.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

294.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

295.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

296.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Equinix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

297.    Plaintiff on behalf of Equinix has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Unjust Enrichment

298.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

299.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Equinix.

300.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Equinix that was tied to the performance or artificially-inflated valuation of Equinix or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

301.    Plaintiff, as a shareholder and a representative of Equinix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

302.    Plaintiff on behalf of Equinix has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Waste of Corporate Assets

303.    Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

304.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

305.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; and (2) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

306.    As a result of the waste of corporate assets, the Individual Defendants are liable to

1    the Company.

2        307.    Plaintiff, on behalf of Equinix, has no adequate remedy at law.

3                            **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiff demands judgment as follows:

5        A.    Declaring that Plaintiff may maintain this derivative action on behalf of Equinix

6    and that Plaintiff is a proper and adequate representative of the Company;

7        B.    Against all of the Defendants and in favor of Equinix for the amount of damages

8    sustained by the Company as a result of the acts and transactions complained of herein;

9        C.    Granting appropriate equitable relief to remedy the Defendants' breaches of

10   fiduciary duties, including, but not limited to the institution of appropriate corporate governance

11   measures;

12       D.    Awarding Equinix restitution from Defendants, and each of them, and ordering

13   disgorgement of all profits, benefits and other compensation obtained by Defendants;

14       E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

15   attorneys' and expert fees and expenses; and

16       F.    Granting such other and further equitable relief as this Court may deem just

17    and proper.

18

19

20                          **JURY DEMAND**

21       Plaintiff hereby demands a trial by jury.

22       Dated: February 26, 2025            Respectfully submitted,

23                                           **THE ROSEN LAW FIRM, P.A.**

24                                           /s/Laurence M. Rosen
25                                           Laurence M. Rosen, Esq. (SBN 219683)
                                             355 South Grand Avenue, Suite 2450
26                                           Los Angeles, CA 90071
                                             Telephone: (213) 785-2610
27

28                            103

Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Tanay Gandhi, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 2/25/2025

Signed by:

Tanay Gandhi